***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Gregory and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Gregory, with modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner and in the Pretrial Agreement as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over this matter wherein all parties are correctly designated and were subject to the Workers' Compensation Act at the time of the alleged injury.
2. An employer/ employee relationship existed between the parties at the time of the alleged injury.
3. Plaintiff sustained an alleged injury to her back that arose out of and in the course of her employment and resulted in a specific traumatic incident on May 8, 2002.
4. The carrier denies the compensability of this claim.
5. At the time of the alleged injury, plaintiff earned an average weekly wage of $314.74, yielding a compensation rate of $209.83.
6. Plaintiff last worked for defendant-employer on September 24, 2002.
7. Documents stipulated into evidence include the following:
a. Stipulated Exhibit 1: Pretrial Agreement
b. Stipulated Exhibit 2: Medical records, IC forms, an accident report and updated medical records submitted post-hearing.
c. Defendants' Exhibit 1: Recorded statement.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was 45 years old at the time of the hearing before the Deputy Commissioner, and had obtained a GED and attended one and a half years of college. Prior to plaintiff's employment with defendant-employer, she worked as a sewing machine operator and a machine operator debarking and labeling wood. Thereafter, plaintiff worked full time for approximately three years as a grounds person for defendant-employer earning $8.90 per hour. Plaintiff's duties included running a chipper machine, loading the chipper, lifting wood, moving wood, moving debris and going through brush and underbrush. The job included a lot of lifting, for over half of a 10-hour workday. Plaintiff estimated that the heaviest weight she would lift at one time would be about 30 pounds, but she usually would have assistance; however, the job description indicates that lifting was required of up to 50 pounds.
2. Plaintiff was performing her duties as a grounds person on May 8, 2002 when she sustained an injury to her lumbar spine. Plaintiff was loading wood into the chipper with a co-employee, Chris, who was also plaintiff's son. Plaintiff was loading the wood or small trees at an awkward angle, due to the way the truck was parked on the shoulder of the road close to a ditch, which resulted in the lack of adequate ground to get "sure footing". Usually plaintiff worked under conditions where she had firm footing when loading the chipper. In her recorded statement, plaintiff related that she had to load the chipper on the side of the road instead of in the usual area beside or behind the highway; however, plaintiff did not elaborate on the awkwardness of the situation. Plaintiff further indicated that she turned wrong and her leg and calf cramped to the point it was unbearable and she had to "hop" across the road. Plaintiff also indicated that she had hip pain and did not understand her injury. Plaintiff elaborated on the mechanism of injury at the hearing testifying that the chipper kicked back which caused her increased difficulty while in the awkward loading position resulting in pain down her right leg into her calf, like a cramp.
3. After plaintiff finished feeding the chipper, she hopped across the street and sat on the ditch bank due to excruciating pain. In fact, plaintiff could not walk on her right leg due to the cramping in her calf and hip. After sitting down, plaintiff began to feel pain in her hips and lower back as well as her calf. Plaintiff later realized that what she was calling hip pain was actually lower back pain.
4. Plaintiff's supervisor who is also her husband, Terry Shearin, and a supervisor from Piedmont Electric, Jerry Phelps, both saw her hobble across the road and sit down. Mr. Phelps and Mr. Shearin discussed whether plaintiff had a cramp due to the hot weather and the crews were cautioned against overheating. Due to the physical nature of this type of work, it is not unusual for a worker to sprain or strain a muscle. In fact, plaintiff has had sore muscles and back strains in the past.
5. Plaintiff did not fill out an incident report at that time, nor was she asked by anyone, including her supervisor, to fill one out as apparently no one realized the severity or true nature of the injury. Plaintiff spent the rest of the day in the truck. When she returned to work the next day, May 9, 2002, she performed some lighter tasks that are part of her normal duties including cleaning saws, straightening the truck and raking in order to avoid any lifting.
6. Kelvin E. Wynn, MD, Plaintiff's primary care physician, was the first to treat her after the incident at work when plaintiff was scheduled for an annual physical on May 10, 2002. Plaintiff complained of pain in the right side of her back radiating through the right leg with some cramping. While Dr. Wynn's notes indicate that plaintiff had a two month history of pain and while Dr. Wynn was fairly certain his notes were accurate, the greater weight of the evidence of record including plaintiff's testimony as well as corroborative witnesses who saw plaintiff "hop" across the road demonstrates that plaintiff had actually suffered pain for two days instead of two months. Dr. Wynn diagnosed lumbar radiculopathy and prescribed Celebrex for plaintiff who returned to the clinic on June 10, 2002, at which time a physician's assistant prescribed Lortab, Percocet and Toradol and ordered an MRI due to plaintiff's continued complaints. Upon reviewing the MRI of June 25, 2002, which revealed herniated discs at L4-5 and L5-S1, an appropriate recommendation was made for plaintiff to see an orthopaedist.
7. Plaintiff had pre-existing back complaints and degenerative disc disease as well as a prior herniated disc based upon later findings during surgery. However, plaintiff's prior visits to Dr. Wynn's clinic for back pain, in November 2000 and October 1997-January 1998, resulted in diagnoses of back sprains or strains, which were isolated events that fully resolved after treatment with Ibuprofen and a muscle relaxant. Prior to the May 8, 2002 injury at work, plaintiff had not been seen for any back problems since November 2000 and she did not complain of back problems at her annual visit in May 2001. Furthermore, before May and June of 2002 there were no clinical signs of neurological damage caused by herniated discs, although a possible mild radiculopathy was discussed. Finally, plaintiff performed heavy physical work for approximately 10 hours per day for the three years preceding her injury without difficulty.
8. Dr. Wynn stated that to a reasonable degree of medical certainty, if plaintiff was standing in an awkward position while loading the chipper and experienced a cramping feeling in her right calf and hip area that such an incident caused her to herniate a disc. If her symptoms became worse after the May 8, 2002 incident, the incident could have substantially aggravated any pre-existing condition, or any disc dysfunction. Dr. Wynn believed that the information plaintiff gave to him was genuine.
9. Plaintiff was referred to Triangle Orthopaedics where her treating physician was primarily Dr. Thomas A. Dimmig. The history taken from plaintiff at her first visit on July 1, 2002 indicated that she had lower back pain for 1-2 months, and it had worsened in the last 4-6 weeks. This time frame supports plaintiff's May 8, 2002 injury date. The office note also indicated that plaintiff lifts and pulls often while work, which again supports plaintiff's claim of a work related injury regardless of the fact that she did not provide a more detailed description of her mechanism of injury.
10. At her visit with Dr. Dimmig on July 1, 2002, plaintiff had a positive femoral nerve stretch test, which is consistent with a disc herniation at the L4-5 level. The MRI taken on June 25, 2002 showed a herniated disc at L5-S1, central but eccentric to the right, and a central disc herniation at L4-5. Plaintiff also had degenerative changes to the L5-S1 disc. Plaintiff was diagnosed with a herniated nucleus pulposus at both the L4-5 and L5-S1 levels.
11. At plaintiff's next visit with Dr. Dimmig on August 16, 2002, surgery was discussed and recommended. Plaintiff related that her injury should be covered by workers' compensation since she had an accident at work and had witnesses but did not report it at the time. Plaintiff's straight leg raise testing was positive, which is consistent with her MRI findings.
12. During her initial treatment and following her May 8, 2002 injury, plaintiff continued to work but was not capable of performing the same level of work due to her pain. However, she did not report her injury by accident to defendant-employer as she did not have a full understanding of her injury or its severity until after surgery was recommended. Shortly thereafter, plaintiff reported her injury by accident in late August 2002. Plaintiff continued to work until September 24, 2002 when her pain would no longer allow her to continue.
13. Upon her next visit to Dr. Dimmig on September 27, 2002, plaintiff was removed from work pending surgery. Plaintiff again presented with a positive straight leg raise test. Thereafter, a pre-operative appointment took place on October 10, 2002 at which time plaintiff experienced right leg pain. Thereafter, plaintiff underwent surgery on October 14, 2002. Dr. Dimmig performed a hemilaminectomy and diskectomy at both the L4-5 level and the L5-S1 level.
14. The L5-S1 disc was hard and calcified, indicating that it had been there for a while, probably greater than six months, which is consistent with a previous herniation and degeneration. However, the L4-5 disc was not in a calcified condition indicating a more recent herniation.
15. Plaintiff attended several follow up appointments in October, November and December 2002. At the visit of January 17, 2003, Dr. Dimmig discussed a return to work with plaintiff and recommended plaintiff not perform excessively physical work. Dr. Dimmig reviewed plaintiff's job description briefly during the deposition and stated that his opinion about her returning to work remained the same. As of April 10, 2003, plaintiff reached maximum medical improvement and was released with a permanent partial disability rating of 20% to the spine. Plaintiff suffers from chronic pain and is not capable of performing her former employment. Furthermore, plaintiff has permanent work restrictions of no repetitive bending or lifting over 15-20 pounds. Dr. Dimmig believed that she could stand for up to eight hours per day with breaks. Plaintiff is in need of vocational rehabilitation to facilitate a return to work within her assigned restrictions.
16. Upon returning to Dr. Dimmig in August 2003 she was having left lower back pain and left buttock pain, which was a different symptomology than those she initially presented with. An injection was administered and an MRI was performed on September 24, 2003. The MRI showed mild bulging of the L4-5 disc, central but more to the right, some disc bulges above, and degenerative changes that were noted before. Dr. Dimmig diagnosed plaintiff with degenerative lumbar disc disease. These newer problems which first occurred after August 2003 indicate that she is having another type of problem. However, plaintiff's condition in August 2003 could be the result of degeneration or the result of the surgery on the two disks.
17. At a follow up visit in December 2003, other interventions were discussed if plaintiff's pain became intolerable. Plaintiff was found to be at maximum medical improvement for her August 2003 problems. Dr. Dimmig's diagnosis at that point was HNP at L4-5 and L5-S1, on top of pre-existing lumbar degenerative disc disease, which was the current problem. Dr. Dimmig did not increase plaintiff's rating.
18. After reviewing a copy of the recorded statement taken from plaintiff, defense exhibit #1, Dr. Dimmig replied affirmatively, to a reasonable degree of medical certainty, that if the evidence shows that on May 8, 2002 plaintiff was standing in an awkward position in order to load branches or parts of a tree that had been cut down into a chipper, and while doing this, she got a cramp type feeling in her calf and hip area, the HNP at L4-5 and L5-S1 was caused by or materially aggravated by her work-related incident. This reported mechanism of injury is consistent with a disc herniation. Furthermore, the type of pain that plaintiff experienced could have resulted from rupturing a disc at that time. Dr. Dimmig's opinion was based on the physiological consistency with a herniated disc at L4-5 or L5-S1, which was apparent on the MRI scan. In addition, Dr. Dimmig was questioned regarding his opinion, to a reasonable degree of medical certainty, whether or not the pre-existing degenerative changes in plaintiff's lumbar spine were aggravated by the incident at work as described to him. Dr. Dimmig responded that the incident did materially aggravate plaintiff's pre-existing degenerative disc disease. This opinion was based on the history and plaintiff's radiographic findings. When asked if he were able to rule out other causes of her HNP, he replied that based on her history, he has no other reason to think that her condition was not caused by the accident.
19. Dr. Dimmig believed that the information that was given to him by plaintiff was credible and there were no signs of secondary gain motivation. Dr. Dimmig opined that aggressive treatment options are available for plaintiff, but he did not anticipate or recommend those options unless her condition severely deteriorated. Although Dr. Dimmig had earlier completed Form 18M in June 2003 indicating the need for future medical treatment, plaintiff has failed to prove by the greater weight that there is a substantial risk of future medical treatment. The medical treatment rendered to plaintiff by Dr. Dimmig was reasonable and necessary as a result of her injury.
20. Although plaintiff worked until September 24, 2002, she did so by performing lighter duty work. Plaintiff performed less lifting and Terry Shearin cut up wood into very small pieces for her if she had to pick them up or feed them into the chipper. Plaintiff was taking medications during this period as well, including Percocet and Lortab. As of September 24, 2002, surgery had been recommended and plaintiff could not perform the physical work anymore, and her right leg had begun to drag.
21. Plaintiff reported the injury and was instructed to fill out an accident report for in late August. The accident report was apparently received by defendant-employer on September 5, 2002. Thereafter, plaintiff contacted defendant-carrier and a recorded statement was taken from her on October 4, 2002. In her recorded statement she described sustaining specific traumatic incident to her lumbar spine.
22. Plaintiff was terminated by defendant in December 2002. At the time of the hearing before the Deputy Commissioner, plaintiff was still treating with Dr. Dimmig, and was no longer working. Plaintiff has not sought employment due to her understanding of her medical restrictions as well as due to her pain. Dr. Dimmig opined at his deposition on February 24, 2004, that plaintiff's restrictions included no repetitive bending or lifting greater than 15-20 pounds, and standing no more than 8 hours per day with breaks. However, there is no indication that plaintiff was ever specifically advised of her restrictions. Plaintiff believed that she was complying with her restrictions. Dr. Dimmig only articulated her restrictions at his deposition on February 24, 2004, but not directly to plaintiff. Considering these facts, and considering plaintiff's work history and educational experience, as well as her pain, plaintiff has been and continues to be incapable of earning any wages in any employment since September 24, 2002, and continuing. Plaintiff is in need of vocational rehabilitation.
23. Plaintiff gave descriptions of what happened on May 8, 2002 on three different occasions: the late August 2002 accident report completed for defendant-employer, the October 4, 2002 recorded statement taken by the carrier and her live testimony in November 2003. Plaintiff's descriptions of the injury on May 8, 2002 are materially consistent and credible regardless of the fact that she provided more or less details during her reports. Plaintiff consistently indicated in the incident report, the recorded statement and her testimony that the truck was parked on the side of the road and she was loading the chipper from the side, which is significant because the truck was being fed at a different angle than plaintiff was accustomed to, causing plaintiff to stand in an awkward position or to "turn wrong" resulting in leg pain which was witnessed by two other witness who testified at the hearing. Furthermore, plaintiff consistently stated in the incident report, recorded statement and her testimony that she experienced pain while feeding the chipper. The greater weight of the evidence demonstrates that plaintiff suffered a specific traumatic incident as a result of the work assigned during a judicially cognizable period of time.
24. Defendants' argument that employer did not receive notice of the accident as required by N.C. Gen. Stat. § 97-22 is afforded little weight. Plaintiff had reasonable excuse for not giving actual or written notice until late August 2002 and defendant-employer was not prejudiced thereby. Plaintiff informed Terry Shearin, her supervisor, of her injury on the date that it occurred. Furthermore, Mr. Shearin called Ray DeJarnette and asked for two men to help because he thought plaintiff had hurt herself. Furthermore, plaintiff did not know the extent of her injury until surgery was discussed with Dr. Dimmig on August 16, 2002, just two to three weeks before defendants received notice of the accident. Moreover, plaintiff initially thought that she had a cramp in her calf and hips and did not understand the implications of her leg pain. Plaintiff learned in July 2002 that she had herniated discs in her lumbar spine. Finally, plaintiff received conservative medical treatment and did not undergo surgery until after defendants had notice of the injury and had acquired plaintiff's recorded statement. The greater weight of the evidence fails to show that defendants were prejudiced in their investigation and defense of this claim.
25. The greater weight of the medical evidence demonstrates that the May 8, 2002 injury to plaintiff's back caused her need for surgery and her disability. Based on Dr. Dimmig's opinions, it is not possible that plaintiff's pre-existing condition was the sole cause of her complaints following May 8, 2002. Although plaintiff had back problems prior to May 8, 2002 and may have even sustained an HNP at L5-S1 before May 8, 2002, the Full Commission finds that the greater weight of the evidence establishes that the incident aggravated plaintiff's pre-existing condition and/or resulted in a new injury.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. On May 8, 2002, plaintiff sustained an injury to her back that arose out of and in the course of her employment as the direct result of a specific traumatic incident of the work assigned during a cognizable time period. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff had a reasonable excuse for the delay in her reporting the injury and defendants were not prejudiced by receiving notice of the accident in September 2002. Therefore, plaintiff's claim is not barred under N.C. Gen. Stat. § 97-22.
3. As a result of her specific traumatic incident, plaintiff is entitled to temporary total disability benefits beginning September 24, 2002 and continuing until further order of the Commission at the rate of $209.83 per week. N.C. Gen. Stat. § 97-29.
4. As a result of her specific traumatic incident, plaintiff is entitled to all medical treatment rendered to plaintiff which was reasonable and necessary to effect a cure, give relief or lessen her period of disability. However, plaintiff has failed to prove that a substantial risk of future medical treatment is necessary and therefore statutory limitations apply. N.C. Gen. Stat. §§ 97-25 and 97-25.1. Dr. Dimmig and Dr. Wynn are designated as plaintiff's treating physicians.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay to plaintiff temporary total disability compensation at the rate of $209.83 per week from September 24, 2002 and continuing until further order of the Commission. The amounts already accrued shall be paid in one lump sum, subject to attorney's fees awarded herein.
2. Defendants shall pay for and provide all reasonable and necessary medical care and reasonable vocational rehabilitation services including treatment already rendered and future treatment pursuant to N.C. Gen. Stat. § 97-25, subject to the limitations of N.C. Gen. Stat. § 97-25.1. Dr. Dimmig and Dr. Wynn are hereby designated as plaintiff's treating physicians.
3. Plaintiff's counsel is entitled to reasonable attorney's fees in an amount equal to twenty five percent (25%) of the sums due plaintiff under subsection 1 of this Award to be paid directly to plaintiff's counsel by deducting one-fourth of the lump sum due plaintiff and thereafter by every fourth check to be paid directly to plaintiff's counsel.
4. Defendants shall pay the costs due the Commission.
This 15th day of December 2004.
 S/_____________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER